**Beverly Ann Bowker DAVIDSON,**
**Plaintiff/Appellant,**

v.

**Jerry DAVIDSON, Defendant/Appellee.**

Court of Appeals of Tennessee,
Western Section, at Jackson.

July 24, 1995.

Application for Permission to Appeal
Denied by Supreme Court
Oct. 30, 1995.

James F. Arthur, III, Germantown, for Plaintiff/Appellant.

James S. Cox and Russell Fowler, Memphis, for Defendant/Appellee.

FARMER, Judge.

The subject of this domestic relations dispute concerns the proper allocation of a reduction in Husband's pension benefits to the parties, Jerry Davidson (Husband) and Beverly Ann Bowker Davidson (Wife). After entry of a final divorce decree, and ostensibly in accordance with Rule 60.02 T.R.C.P, the trial court granted Husband's motion to modify a Qualified Domestic Relations Order (QDRO) providing for the equal distribution of this particular marital asset, but calling for any reduction in plan benefits to be borne solely by Husband. At issue is whether the trial court exceeded the scope of Rule 60 in affording relief to the husband. For reasons hereinafter expressed, we reverse the judgment of the trial court.

The parties were divorced by final decree entered on July 7, 1989.[1] The decree incorporated by reference a Marital Dissolution Agreement (MDA) executed between the

---

1. Wife amended her original complaint for divorce to add Eastern Airlines, Inc., Husband's employer, as a party defendant.

parties.[2] As here pertinent, it states as follows:

5. The parties acknowledge and agree that any right, entitlement, benefit or prospect of pecuniary advantage vested in Husband on the date of execution of this Agreement by virtue of Husband's employment with Eastern Airlines, Inc., is marital property within the meaning accorded that term in § 36–4–121 Tennessee Code Annotated. . . .

a. The parties acknowledge that, at the time of execution of this Agreement, Husband has been separated from regular employment by Eastern Airlines, Inc. as a direct result of such physical incapacity that he is "disabled" from continued employment as a flight member, co-pilot or engineer by the said Eastern Airlines, Inc. and it is the intention of the parties that each and every right, entitlement, benefit or prospect of pecuniary advantage, which, but for the intervention of divorce, would have flowed to the parties jointly and severally by virtue of Husband's regular employment by the said Eastern Airlines, Inc. and separation therefrom under those circumstances above-mentioned, be apportioned, allocated and divided between the parties in equal shares.

b. The parties acknowledge that said rights, entitlements, benefits and prospects of pecuniary advantage are such that the division thereof may only be accomplished in conformity with provisions of certain "Benefit Plans" of Eastern Airlines, Inc. and provisions of the Internal Revenue Code of the United States and Rules and Regulations promulgated pursuant thereto by entry in the above-captioned cause of a "Qualified Domestic Relations Order". . . . It is, however, the intention of the parties that the "equality" of the division of property provided for herein be determined by reference to "parity in result" only, and, in the event circumstances beyond the control of the parties shall effectively preclude avoidance of detriments of the type contemplated herein, then the parties agree that each shall do any and all things necessary to accomplish, by any lawful and legitimate means, apportionment of benefits and detriments between the parties so as to achieve reasonable parity between them.

c. The parties acknowledge that the rights, entitlements, benefits and prospects of pecuniary advantage mentioned herein include entitlement to distributions of money according to the terms of certain "Benefit Plans" of Eastern Airlines, Inc. known by the parties as "Plan A" and "Plan B."

(1) The parties acknowledge that "Plan A" is a "defined benefit retirement income plan," and it is contemplated, intended and agreed by the parties with respect to "Plan A" that each do any and all things necessary to cause a regular, periodic distribution of cash to be made directly from said plan to each party in equal amounts during his or her lifetime. The parties acknowledge that there is, at the time of execution of this Agreement, a risk that "Plan A" is or may become insolvent to the extent that distribution from said plan may be impaired, in whole or in part.

. . . .

d. Preparation of "Qualified Domestic Relations Orders" . . . necessary to accomplish the foregoing shall be the responsibility of Wife, . . .

A "Qualified Domestic Relations Order" was entered with the trial court on March 13, 1989, stating, as relevant here:

IT APPEARING to the Court that [Wife] and [Husband], in their [MDA] . . . have agreed to apportion, allocate and di-

---

**2.** The final decree states:

The parties have entered into a written [MDA] dated November 18, 1988 and heretofore filed in the cause on November 21, 1988 which the court affirmatively finds makes an equitable settlement of any and all property rights between the parties.

. . . .

Each and every term and provision of that certain [MDA] heretofore filed in the cause be and is hereby incorporated by reference herein, as fully as if set forth verbatim, and the parties, and each of them, shall obey and abide by the same.

vide between them in equal shares all of those rights, entitlements, benefits or prospects of pecuniary advantage which but for the intervention of divorce would have flowed to the parties jointly and severally by virtue of Husband's regular employment by Eastern Airlines, ... and the parties have prepared and have agreed to cause the following [QDRO] ... to be entered in this Court, ...

1. This [QDRO] applies ... to the Eastern Airlines Pilots Fixed Benefit Retirement Income Plan ("A" Plan)....

. . . .

4. This Order creates a right in the Alternate Payee[3] to receive the sum of One Thousand Five Hundred Seven and 15/100 Dollars ($1,507.15) monthly, payable as a single life annuity from the "A" Plan.... If the aggregate amount due to Husband and Wife under the "A" Plan is reduced because of a change in Husband's status as "disabled" pursuant to the "A" Plan or for any reason, then in such event, the Alternate Payee shall continue receiving payments under the "A" Plan in the amount set forth above. It is expressly understood and agreed to by the parties hereto that any such reduction in the amount due under the "A" Plan shall be deducted solely from any amounts receivable by the Husband pursuant to the "A" Plan. The intent of the above is to transfer the described allocated benefit to Alternate Payee.

The QDRO contains the signatures of counsel for both parties.

In June 1992, Husband filed a "Petition to Modify, Alter, or Correct Final Decree of Divorce," seeking to modify the QDRO "to reflect the intent of the parties as evidenced in their [MDA]." Husband asserted that as a result of the bankruptcy of Eastern Airlines, the benefits payable under Plan A had been reduced and the parties were no longer receiving equal shares due to the wording of the QDRO. Husband stated that the entire reduction in benefits was taken from his share and that, although Wife's share had remained at $1,507, his benefits had been reduced to $990. He insisted that a "discrepancy or dichotomy" existed between the final decree and the QDRO and that it was the intent of the parties, as reflected in the MDA and final decree, that both draw equally from Plan A during his or her lifetime. Husband requested that the trial court correct the QDRO so that the total monthly benefits from Plan A, $2,497, be distributed equally.

In July 1993, Husband filed a "Motion to Modify, Alter, or Correct [QDRO], and for Other Remedies," [4] basically reiterating the allegations in the petition, but requesting as additional relief a judgment against Wife for any and all funds incorrectly paid her due to the "error" in the QDRO. In the alternative, Husband requested that the appropriate amounts be deducted from Wife's share of the monthly benefits. In response, Wife denied the existence of any "discrepancy or dichotomy" between the final decree and the QDRO and contended that the trial court was without jurisdiction to afford Husband any relief. She also filed a counterpetition to set aside and vacate the final decree in part and for alimony.[5]

The trial court granted Husband's motion, determining that the benefits under Plan A were reduced effective October 1, 1991 and that in accordance with the QDRO, the entire reduction was charged against Husband's share. The court further determined that Husband did not read the QDRO until January 1, 1992. The QDRO was amended to provide for the equal distribution of available benefits under Plan A to Husband and Wife during his or her lifetime. The court expressly rejected Wife's contention that it was without jurisdiction to afford Husband his requested relief. The judgment was ren-

---

3. The order identifies Wife as alternate payee.

4. This motion was filed after Husband retained new counsel.

5. Wife's counterpetition sought to vacate the final decree as it relates to alimony. The merits of this petition are not at issue on this appeal.

dered final in accordance with Rule 54.02 T.R.C.P.

Wife states the issues on appeal as follows:

A. Whether the trial court had no jurisdiction to modify, amend or correct the Qualified Domestic Relations Order, except in accordance with provisions of Rule 60 Tennessee Rules of Civil Procedure.

B. Whether Husband was barred, as a matter of law, from relief pursuant to Rule 60 Tennessee Rules of Civil Procedure, and, therefore, the trial court erred in modifying the Qualified Domestic Relations Order.

C. Even if Husband was not precluded from Rule 60 relief as a matter of law, whether he failed to prove entitlement to relief as a matter of fact, and the trial court erred in modifying the Qualified Domestic Relations Order.

■ The trial court granted Husband relief from the effects of the QDRO due to, as Husband makes reference, its "erroneous wording." To answer the issues now before us, it is first necessary to determine the effect of the final decree's entry on the QDRO. It is Husband's contention that the QDRO and the final decree, which incorporated the MDA, cannot both stand. He insists that one of these "final orders" must be negated due to the seemingly conflicting language. He states that "the real issue ... is not simply whether the [QDRO] can be amended, but which final order will be followed." It is Wife's position that the QDRO is either a "specification" of the MDA or a separate agreement entered into pursuant to the MDA and, thus, consistent with it. Wife further asserts that since the QDRO and the MDA are agreements respecting the same subject matter, the doctrine of merger applies. She correctly cites *Magnolia Group v. Metropolitan Dev. and Hous. Agency,* 783 S.W.2d 563, 566 (Tenn.App.1989), for the proposition that "the last agreement concerning the same subject matter that has been *signed* by all parties supersedes all former agreements, and the last *contract* is the one that embodies the true agreement."

There is, of course, only one final judgment and from that we must now discern the parties' respective rights and obligations as they relate to the distribution of this particular asset. Pursuant to Rule 54.02 T.R.C.P., the QDRO constituted an interlocutory order subject to revision by the trial court at any time prior to entry of the final decree. Once the final decree was entered, the QDRO either merged into the final decree or was eliminated altogether, if conflictive with the final decree.

The court of appeals in *Engert v. Peerless Ins. Co.,* 53 Tenn.App. 310, 382 S.W.2d 541 (1964), held:

It is a well-recognized principle of contract construction that the intention of the parties as ascertained from the entire context of their agreement is controlling. And where an executed agreement refers to other documents and makes their conditions part of the executed agreement, the documents must be interpreted together as the agreement of the parties. *Real Estate Management v. Giles,* 41 Tenn.App. 347, 293 S.W.2d 596; *Scott v. McReynolds,* 36 Tenn.App. 289, 255 S.W.2d 401; *Gibbs v. Trinity Universal Ins. Co.,* Okl., 330 P.2d 1035; 9 Am.Jur., Building and Construction Contracts, Sec. 96, p. 62; 11 C.J.S. Bonds § 43, P. 423, and cases there cited.

*Engert,* 382 S.W.2d at 547.

The construction of a contract was addressed by the court in *Associated Press v. WGNS, Inc.,* 48 Tenn.App. 407, 348 S.W.2d 507 (1961), when stating:

It is the universal rule that a contract must be viewed from beginning to end and all its terms must pass in review, for one clause may modify, limit or illuminate another.

As is said in 6 R.C.L. page 838 under the title "Contracts",

"Taking its words in their ordinary and usual meaning, no substantive clause must be allowed to perish by construction, unless insurmountable obstacles stand in the way of any other

course. Seeming contradictions must be harmonized if that course is reasonably possible. Each of its provisions must be considered in connection with the others, and, if possible, effect must be given to all. A construction which entirely neutralizes one provision should not be adopted if the contract is susceptible of another which gives effect to all of its provisions. The courts will look to the entire instrument, and, if possible, give such construction that each clause shall have some effect, and perform some office."

*Associated Press,* 348 S.W.2d at 512.

 Applying the foregoing principles of contract law to the case at bar, we find that the MDA clearly anticipates the entry of a QDRO, setting forth in detail a distribution scheme for Husband's pension. Thus, we hold that both the MDA and the QDRO detail the agreement of the parties. We further hold their respective provisions reconcilable. As aptly pointed out by Wife, the MDA fails to specifically address the consequences of a reduction in the plan's benefits. The QDRO speaks directly to this situation. Moreover, unlike the MDA, it concerns itself only with the distribution of Husband's pension benefits. The record indicates that, initially, the parties received an equal distribution of this asset as provided for in both the MDA and the QDRO. The need for a reduction, however, invoked the special provisions of the latter. As a general rule, where both general and special provisions relating to the same thing exist in a contract, the special provisions ordinarily control. *Cocke County Bd. of Hwy. Comm'rs. v. Newport Utilities Bd.,* 690 S.W.2d 231, 237 (Tenn.1985). To summarize: inasmuch as the MDA makes specific reference to the entry of a QDRO and their respective provisions may be consistently construed, we conclude that both are embodied within the mandates of the final decree. Hence, any reduction in benefits under the plan is to be calculated in accordance with the express language of the QDRO.

We next consider whether the trial court was correct in affording Husband relief from the final decree. Rule 60.02 T.R.C.P. states:

**Mistakes; Inadvertence; Excusable Neglect; Fraud, etc.**

On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order or proceeding for the following reasons: (1) mistake, inadvertence, surprise or excusable neglect; (2) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (3) the judgment is void; (4) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that a judgment should have prospective application; or (5) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1) and (2) not more than one year after the judgment, order or proceeding was entered or taken.

 Relief granted pursuant to Rule 60.02 is in the sound discretion of the trial judge. *Underwood v. Zurich Ins. Co.,* 854 S.W.2d 94, 97 (Tenn.1993). The scope of our review is to determine whether or not the trial court abused its discretion. *Underwood,* 854 S.W.2d at 97. The party seeking relief bears the burden of proof and must describe the basis for relief with specificity. He must show by clear and convincing evidence that relief from the judgment is warranted. *Duncan v. Duncan,* 789 S.W.2d 557, 563 (Tenn.App.1990).

 It appears that Husband's requested relief is based upon an alleged mistake in the wording of the QDRO and his own inadvertence or excusable neglect in failing to read the document until January 1992. Husband testified that he first "laid eyes on [the QDRO]" on January 2, 1992 after learning that his monthly checks had been reduced by $600. In accordance with Rule 60.02, a request for relief pursuant to reason (1) must be pursued not more than one year after the judgment was entered or, in this instance, July 7, 1990. It is without question that

Husband failed to request any relief until June 1992. Thus, he can be afforded no relief pursuant to subsection (1).

 Husband insists that he could have acted no sooner because he was totally unaware of the QDRO until its reading in January 1992. He contends that relief is available under subsection (5) which places no time restraint upon the filing of a motion for relief if pursued thereunder. Subsection (5) is construed narrowly by the Tennessee courts and is "to be invoked only in cases of overwhelming importance, or those involving extraordinary circumstances or extreme hardship." *Underwood*, 854 S.W.2d at 97. *Wallace v. Aetna Life & Casualty Co.*, 666 S.W.2d 66 (Tenn.1984) holds that, "[a] claim cannot be asserted under subsection (5) of T.R.C.P. 60.02 simply because relief under other provisions is time barred." *Wallace*, 666 S.W.2d at 67. We find no redress for Husband pursuant to Rule 60.02(5).

Moreover, we do not find Husband's purported "error" to be that contemplated by Rule 60. The well settled law in this state is that a client is charged with the knowledge of his attorney under an agency theory. *Batchelor v. Heiskell, Donelson, Bearman, Adams, Williams & Kirsch*, 828 S.W.2d 388, 394 (Tenn.App.1991). Since the QDRO was signed by Husband's attorney, we can only assume that counsel read the prepared order prior to entry and his knowledge was imputed to Husband. In *Moody v. Moody*, 681 S.W.2d 545 (Tenn.1984), the wife sought relief from the final divorce decree pursuant to Rule 60.02, claiming that she had not personally received notice of the final decree's entry until after the time to appeal had expired. *Moody*, 681 S.W.2d at 546. Our supreme court held that the wife was not entitled to relief because at the time the final decree was entered the wife was represented by counsel who had approved the decree entered by the trial court and knew of the entry. *Id. Moody* held that, "[c]ounsel's knowledge must be attributed to his client, if the actions of the court are to have any efficacy." *Id.*

Accordingly, we hold that the trial court erred in affording Husband relief from the final decree under the confines of Rule 60. We, therefore, reverse the judgment entered by the trial court and remand this cause for further proceedings herewith consistent. Costs are taxed to Jerry Davidson, for which execution may issue if necessary.

CRAWFORD, J., and McLEMORE, Special Judge, concur.